# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JANE B. GRIGGS, as Special Administrator of the Estate of Richard O. Bertschinger, Sr., deceased,<br><br>                     Plaintiff,<br><br>      v.<br><br>THE VANGUARD GROUP, INC. and VANGUARD MARKETING CORPORATION,<br><br>                  Defendants. | Civil Action No. 5:17-CV-01187-SLP |

**DEFENDANT VANGUARD MARKETING CORPORATION'S _PUBLIC_, _REDACTED_ MEMORANDUM OF LAW IN SUPPORT OF MOTION _IN LIMINE_ TO PRECLUDE EXPERT TESTIMONY OF DR. DANA CHIDEKEL**

# TABLE OF CONTENTS

I.    FACTUAL AND PROCEDURAL BACKGROUND ............................................ 1

II.   LEGAL ARGUMENT ................................................................................. 2

    A.    Legal Standard ................................................................................ 2

    B.    Redacted

                                             ............................................................ 4

    C.    The Chidekel Report is not reliable .............................................. 5

        1.    Redacted

                                   7

        2.    Dr. Chidekel's flawed methodology renders her opinions
            inadmissible ................................................................... 11

            a)    Dr. Chidekel relies on a logically inapplicable legal
                standard for contractual capacity. .......................... 12

            b)    The Chidekel Report places disproportionate weight
                on interviews of persons who (i) have a financial
                interest in the outcome of this litigation; (ii) had no
                contact with Mr. Bertschinger during his childhood;
                and (iii) had no contact with Mr. Bertschinger during
                the relevant periods. ............................................. 14

            c)    Redacted

                                 ................................................... 16

        3.    Redacted

                              .................................................. 18

            a)    Dr. Chidekel's opinion that Mr. Bertschinger lacked
                contractual capacity during the 1999 relevant period is
                drawn exclusively from alleged errors on the August
                11, 1999 VMC Brokerage Account application .................. 19

i

b)      Dr. Chidekel's opinion that Mr. Bertschinger lacked
         contractual capacity during the 2001 relevant period is
         not supported by any evidence.............................................. 23

III.   CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

B-S Steel of Kan., Inc. v. Tex. Indus., Inc.,
  439 F.3d 653 (10th Cir. 2006) ...................................................................... 13

Bill Barrett Corp. v. YMC Royalty Co.,
  918 F.3d 760 (10th Cir. 2019) ........................................................................ 3

Blatt v. Manhattan Med. Grp., P.C.,
  131 A.D.2d 48 (First Dept. 1987) ................................................................. 12

Brinkley v. Berryhill,
  No. 17-cv-00775-RBJ, 2018 WL 1366692 (D. Colo. Mar. 16, 2018) ........................ 16

Daubert v. Merrell Dow Pharms., Inc.,
  509 U.S. 579 (1993) ............................................................................... *passim*

Dodge v. Cotter Corp.,
  328 F.3d 1212 (10th Cir. 2003) .................................................................. 4, 6

Gen. Elec. Corp. v. Joiner,
  522 U.S. 136 (1997) ................................................................................... 7

Hall v. Conoco Inc.,
  886 F.3d 1308 (10th Cir. 2018) ....................................................................... 6

Ilyia v. El Khoury,
  No. C11-1593RSL, 2013 WL 5441356 (W.D. Wash. Sept. 27, 2013) ...................... 15

Kumho Tire Co. v. Carmichael,
  526 U.S. 137 (1999) ................................................................................... 3

Mitchell v. Gencorp Inc.,
  165 F.3d 778 (10th Cir. 1999) ....................................................... 6, 12, 14, 18

Norris v. Baxter Healthcare Corp.,
  397 F.3d 878 (10th Cir. 2005) ....................................................................... 19

Ortelere v. Teachers' Retirement Bd.,
  25 N.Y.2d 196 (1969) ................................................................................. 12

Ralston v. Smith & Nephew Richards, Inc.,
  275 F.3d 965 ........................................................................................ 3, 5

Velez v. Metropolitan Life Ins. Co.,
  723 F.2d 7 (10th Cir. 1983) ...................................................................... 6

**Rules**

Fed. R. Evid. 104(a) ...................................................................................... 4

Fed. R. Evid. 702 ............................................................................... 2, 3, 4, 5

**Other Authorities**

Williston on Contracts, § 10:1 .................................................................... 13

Defendant Vanguard Marketing Corporation ("VMC")  hereby submits this memorandum of law in support of its Motion *in Limine* to preclude Dr. Dana Chidekel from testifying at the trial of this matter, and to preclude Plaintiff from making any use of or reference to Dr. Chidekel's report at the trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The only issue for trial is whether decedent Richard O. Bertschinger, Sr. possessed contractual capacity to enter into an August 11, 1999 Brokerage Account Agreement with VMC or a September 4, 2001 Margin Agreement with VMC (collectively, the "VMC Agreements").[1]  In support of her capacity challenge to the VMC Agreements, Plaintiff disclosed that she intends to rely at trial on the testimony of Dr. Dana Chidekel, Ph.D. (the "Chidekel Report").  A copy of the Chidekel Report is attached as **Exhibit 1**.  A copy of Dr. Chidekel's updated curriculum vitae ("CV") is attached as **Exhibit 2**.

On June 4, 2021, Defendants deposed Dr. Chidekel.  A copy of Dr. Chidekel's deposition transcript is attached as **Exhibit 3**.  Dr. Chidekel's sworn testimony demonstrates that (1) Dr. Chidekel was not qualified to render the opinions in her report; and (2) the Chidekel Report is unreliable due to its misapplication of methodologies, its use of improper data and assumptions, and its general failure to conform to accepted standards in the relevant field.  Accordingly, the Court should grant VMC's motion in

---

[1]  In its February 5, 2021 Order (Doc. No. 116) denying VMC's and its co-defendant The Vanguard Group, Inc.'s ("VGI") motion for partial summary judgment on that issue, the Court set forth the factual background as it relates to the issue of Mr. Bertschinger's capacity and the VMC Agreements at issue.  VMC accordingly incorporates it herein.

limine and preclude Dr. Dana Chidekel from testifying at trial and preclude Plaintiff from making any use of or reference to the Chidekel report at trial.

## II.    LEGAL ARGUMENT

### A.    <u>Legal Standard</u>

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  Rule 702 expressly provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principals and methods; and
>
> (d)    the expert has reliably applied the principals and methods to the facts of the case.

FED. R. EVID. 702.  Trial courts function as "gatekeepers" with respect to the admission of expert evidence pursuant to Rule 702.  <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993).  The rule "imposes a special obligation upon a trial judge" to determine whether a proposed expert is qualified to offer testimony, and whether that testimony is both relevant and reliable.  <u>Id.</u> at 589.  "'[T]he court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in <u>Daubert</u>.'"  <u>Bill Barrett Corp. v. YMC Royalty Co.</u>, 918 F.3d 760, 770 (10th Cir. 2019) (quoting <u>United States v. Nacchio</u>, 555 F.3d 1234, 1241 (10th Cir. 2009).

The Court must be certain that "an expert whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). This inquiry is to be "flexible" and "tied to the facts of a particular case." Id. at 150 (internal quotations omitted). "Where an expert testifies based on experience, the tribunal reviews the reliability of the testimony with reference to the nature of the issue, the expert's particular expertise, and the subject of the testimony." Bill Barrett Corp., 918 F.3d at 770 (cleaned up).

For a witness to qualify as an expert, the witness must have "specialized knowledge" regarding the area of testimony. FED. R. EVID. 702(a). An expert is not qualified where he or she lacks any relevant education, experience, or training regarding the subject matter of the expected testimony. See, e.g., Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969–70 (affirming trial court's exclusion of orthopaedic surgeon's expert testimony because surgeon lacked knowledge of specific medical subject at issue). "The dispositive question" is whether the required specialized knowledge is "within the reasonable confines" of the expert's subject area. Id. at 970. "[M]erely possessing a medical degree," for example, "is not sufficient to permit a physician to testify concerning any medical-related issue." Id.

The expert's report also must be reliable. The Supreme Court identified four non-exhaustive factors as useful in conducting this analysis:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or

potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

Dodge v. Cotter Corp., 328 F.3d 1212, 1222 (10th Cir. 2003) (citing Daubert, 509 U.S. at 593–94).  Finally, the party offering the expert has the burden of proving admissibility by a preponderance of the evidence.  See FED. R. EVID. 104(a); see also Daubert, 509 U.S. at 592, n. 10.

**B.    Dr. Chidekel is not qualified to render a posthumous opinion that Mr. Bertschinger suffered from undiagnosed Asperger's disorder during his lifetime or that Mr. Bertschinger lacked contractual capacity.**

To be qualified as an expert in this matter, Dr. Chidekel must possess "specialized knowledge" to determine posthumously whether Mr. Bertschinger possessed or lacked contractual capacity during the relevant periods identified by the Court.  FED. R. EVID. 702(a).  Redacted

Dr. Chidekel's deposition testimony affirmed this critical failure—she admitted that she has no such experience by training, in her practice, or in her publications and speeches.  (See Chidekel Dep., Ex. 3 at 14:8–15:16; 23:20–24; 27:20–23; 29:24–33:9.)

Redacted

Redacted

y, doing so is not within "the reasonable confines" of Dr. Chidekel's professional experience.  <u>Ralston</u>, 275 F.3d at 970.  The Chidekel Report is inadmissible under Rule 702(a) as a result.

  C. <u>**The Chidekel Report is not reliable.**</u>

   In addition, the opinions set forth in the Chidekel Report should be precluded for the separate and independent reason that they are not reliable.  The reliability prong of the <u>Daubert</u> analysis further requires that experts ground their opinions in adequate knowledge and data. <u>See</u> <u>Dodge</u>, 328 F.3d at 1222.  An expert's opinion is reliable only if

---

[2] In fact, the vast majority of Dr. Chidekel's clinical experience involves the evaluation of and diagnosis of mental disorders in *children*, not adults.  (<u>See</u> <u>id.</u> at 73:7–11.)

"the reasoning and methodology underlying the expert's opinion . . . is both scientifically valid and applicable to a particular set of facts." Hall v. Conoco Inc., 886 F.3d 1308, 1311 (10th Cir. 2018). The Court "'must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.'" Mitchell v. Gencorp Inc., 165 F.3d 778, 783 (10th Cir. 1999) (quoting Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996)). The Tenth Circuit has previously explained that expert opinions involving posthumous diagnoses are "inherently speculative." Velez v. Metropolitan Life Ins. Co., 723 F.2d 7, 10 (10th Cir. 1983).

"Under Daubert, 'any step [in an expert's analysis] that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" Id. at 782 (quoting In re Paoli R.R. Yard PCB Litig, 35 F.3d 717, 745 (3d Cir. 1994)). Finally, "the proposed expert testimony must be sufficiently tied to the facts of the case." Mitchell, 165 F.3d at 781 (citing Daubert, 509 U.S. at 591).

Here, the Chidekel Report suffers from three fatal reliability flaws. First, Dr. Chidekel's methodology is not generally accepted in the medical or psychological community. Second, even if it was, Dr. Chidekel's flawed methodology renders the Chidekel Report inadmissible. And third, the conclusions in the Chidekel Report are not properly supported. Each opinion contains subjective logical leaps that are either disconnected from, or contrary to, the objective evidence. Dr. Chidekel's ultimate conclusions—Redacted

Redacted                                                    —"is simply too great an analytical

gap between the data and the opinion proffered." <u>Gen. Elec. Corp. v. Joiner</u>, 522 U.S. 136,

146 (1997).  Dr. Chidekel should not be permitted to present these unreliable opinions to

the jury.

    **1.**   Redacted


    Redacted

---

[3]  AMERICAN PSYCHIATRIC ASSOCIATION, DSM-5: Frequently Asked Questions, *What is* DSM *and why is it important?*
(available at <u>https://www.psychiatry.org/psychiatrists/practice/dsm/feedback-and-questions/frequently-asked-questions</u> (last visited July 1, 2021)).

Redacted

Redacted

Redacted

Redacted

(Chidekel Dep., Ex. 3 at 100:9–101:23.)

Redacted

In the Reunion note, Mr. Bertschinger provides a timeline of "Where I've been these last 50 years, or How time flies!!" (Reunion note, Ex. 6.) After describing his life for the past 50 years, Mr. Bertschinger concludes the note by saying that he is "Looking forward to renewing old acquaintances!!" (Id.) And, in the postscript, Mr. Bertschinger tells the letter's recipient that he is "Really looking forward to being with you again after all these years!!" (Id.)

Redacted

.

Redacted

Dr. Chidekel failed to do so.  As a result, the Chidekel Report would not be generally accepted in the medical and psychological community and must be precluded for lacking scientific reliability.

> **2.    Dr. Chidekel's flawed methodology renders her opinions inadmissible.**

Redacted

---

[4]    Redacted

(see Mitchell, 165 F.3d at 782), the Chidekel Report suffers from several analytical missteps.

### a) Dr. Chidekel relies on a logically inapplicable legal standard for contractual capacity.

As an initial matter, the foundation of the Chidekel Report opinion regarding Mr. Bertschinger's contractual capacity is a New York legal standard. (See Chidekel Report, Ex. 1 at 1.) The legal standard the Chidekel Report relies upon is (1) "[b]y reason of a mental illness an individual is unable to control his conduct, even though his cognitive ability seems unimpaired," that (2) "[s]uch conduct is a product of impulse or irrational behavior beyond his control," and (3) "by reason of mental illness or defect . . . he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition."[5] (Id.) Dr. Chidekel's opinion regarding Mr. Bertschinger's contractual capacity to enter into the VMC Agreements expressly relies upon and incorporates this language. (See id.) Dr. Chidekel testified that Plaintiff's counsel told her to use this New York legal standard. (See Chidekel Dep., Ex. 3 at 83:16–22.) The disputed arbitration clause in the 1999 VMC Brokerage Agreement contains a New York choice of

---

[5]    The Chidekel Report's legal standard comes from a pair of New York cases: Ortelere v. Teachers' Retirement Bd., 25 N.Y.2d 196, 202–03 (1969) and Blatt v. Manhattan Med. Grp., P.C., 131 A.D.2d 48, 51–53 (First Dept. 1987). (See Chidekel Report, Ex. 1 at 1.) In Ortelere, the Court of Appeals appears to recognize (but does not specifically adopt) a capacity standard based on protecting those with mental illnesses who cannot control their conduct, so long as the other contracting party knew about that condition. See Ortelere, 25 N.Y.2d at 205. The Blatt opinion follows Ortelere. Incidentally, both cases hold that the plaintiff failed to establish a lack of contractual capacity under that standard.

law provision.  (See Securities Account Agreement at 2, attached as **Exhibit 7**.)  And, the 2001 VMC Margin Agreement is governed by New York law, including its disputed arbitration clause.  (See Margin Account Agreement at 2, attached as **Exhibit 8**.)

The Chidekel Report, however, does not reconcile its opinion that Mr. Bertschinger lacked contractual capacity with its application of a legal standard that necessarily could not apply if Mr. Bertschinger did not possess the requisite mental capacity to enter into the contract with those provisions in the first place.  See B-S Steel of Kan., Inc. v. Tex. Indus., Inc., 439 F.3d 653, 661 n.9 (10th Cir. 2006) (referring to "the logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid"); see also Williston on Contracts, § 10:1 ("Capacity, both legal and mental, is a necessary and constituent element of a simple contract").

Dr. Chidekel admitted this obvious error in her deposition:

Q:  So if they lacked the capacity to contract, your opinion would be that no, they are not obligated by any part of that contract that they just signed?
A:  Correct.

(Chidekel Dep., Ex. 3 at 87:16–20.)

Thus, Dr. Chidekel's opinion that Mr. Bertschinger lacked capacity to enter into the VMC Agreements is built upon an illusory foundation.  The Chidekel Report relies upon the application of a legal standard that logically could not apply unless Mr. Bertschinger possessed the requisite contractual capacity.  It follows that the Chidekel

Report is unreliable as a misapplication of the proper methodology. See <u>Mitchell</u>, 165 F.3d at 782. The Court should accordingly preclude it.

> **b)** **The Chidekel Report places disproportionate weight on interviews of persons who (i) have a financial interest in the outcome of this litigation; (ii) had no contact with Mr. Bertschinger during his childhood; and (iii) had no contact with Mr. Bertschinger during the relevant periods.**

Another methodological flaw in the Chidekel Report is that it relies almost entirely on narratives supplied by Plaintiff and her brother, David Bertschinger—both of whom have a financial interest in the outcome of this litigation—Mr. Bertschinger's nephew Clarence Crumpecker, Jr. (who is 19 years younger than Mr. Bertschinger), and Plaintiff's friend Dr. Debra Mitchell. It would be impossible for any of these people to have known Mr. Bertschinger during his childhood, and Dr. Chidekel testified that none of these people had contact with Mr. Bertschinger during the relevant periods or that she did not know whether they did. (See Chidekel Dep., Ex. 3 at 80:9–18; 90:1–13; 91:14–92:13.)

Redacted

Redacted                                        . Redacted

"[6]

Though she could have tried to interview any number of people who were unbiased, had knowledge of Mr. Bertschinger in his childhood (Mr. Hoover, for example), or dealt with him during the relevant period or close-in-time to the relevant period (Mr. Bertschinger's attorneys, for example), Dr. Chidekel did not do so. At least one District Court excluded an expert's opinion on the issue of prior contractual capacity because of its overreliance on subjective interviews with people who, unlike here, actually had contact with the plaintiff during a relevant period for evaluating capacity, even where the relevant period was only a year prior (unlike the much longer gap here). See Ilyia v. El Khoury, No. C11-1593RSL, 2013 WL 5441356, at *2 (W.D. Wash. Sept. 27, 2013) ("[Plaintiff's expert's] ultimate opinion regarding [plaintiff's] psychiatric status a year earlier is unreliable in that it is based on nothing more than the subjective recollections of a very narrow selection of individuals who had contact with [plaintiff] during the relevant period.") And another District Court affirmed an administrative law judge's denial of disability benefits for ASD as not medically supported, because the "only basis" for the

_____

[6]  Van Niekerk, et al., *Diagnosing autism spectrum disorders in elderly people*, INTERNATIONAL PSYCHOGERIATRICS – November 2010, attached as **Exhibit 9**.

Autism diagnosis was an interview with the claimant's mother, which meant that the diagnosis was not "based on 'medically acceptable clinical or laboratory diagnosis techniques.'" Brinkley v. Berryhill, No. 17-cv-00775-RBJ, 2018 WL 1366692, at *4–5 (D. Colo. Mar. 16, 2018) (quoting Sisco v. U.S. Dep't of Health & Human Svcs., 10 F.3d 739, 744 (10th Cir. 1993)).

The Court should reach the same result here. The Chidekel Report's almost exclusive reliance on subjective, biased, and irrelevant interviews to reach its conclusions is not an accepted methodology in the relevant scientific community, and the opinions in the Chidekel Report are therefore not reliable under Daubert.

**c)** Redacted

Redacted

<span style="color:red">Redacted</span>

Moreover, the Chidekel Report fails to address several items of objective evidence demonstrating that Mr. Bertschinger was managing his own finances and entering into contracts in the aftermath of his wife's death, both during the relevant periods and shortly outside of them.  When presented with each piece of evidence listed below, Dr. Chidekel's testimony was that she did not consider them as part of her report.  The evidence presented to Dr. Chidekel, and the citation to her testimony, is as follows:

- Mr. Bertschinger's July 14, 1998 VGI Money Market Account Agreement (outside relevant periods) (Chidekel Dep., Ex. 3 at 124:12–126:25);
- Mr. Bertschinger's sale of his California vacation home in 1998 and reinvestment of the proceeds with VGI (outside relevant periods) (Id. at 127:1–129:25; 131:17–132:7);

17

- Mr. Bertschinger's September 30, 1998 Affidavit supporting the inventory of Mrs. Bertschinger's estate (outside relevant periods) (<u>Id.</u> at 132:3–22);
- Mr. Bertschinger's chosen portfolio of mutual funds in his American Century Investment Services Account that he opened on June 30, 1999 (outside scope of expertise) (<u>Id.</u> at 159:12–25);
- Bertschinger Oil Company's 1999 federal tax return completed by Mr. Bertschinger showing sales of real property and sales of securities during the 1999 relevant period (did not know about these sales) (<u>Id.</u> at 194:15–199:5);
- Mr. Bertschinger's chosen investment portfolio of mutual funds with VGI and securities with VMC, as set forth in Mr. Bertschinger's August 31, 1999 VGI account statement (outside scope of expertise) (<u>Id.</u> at 200:8–201:19);
- Mr. Bertschinger's involvement in multiple litigations after 2001 ("no opinion") (<u>Id.</u> at 211:11–23); and
- Mr. Bertschinger's execution of various estate planning documents in 2003 ("no opinion") (<u>Id.</u> at 211:24–212:6).

As previously mentioned, <u>Daubert</u> requires Dr. Chidekel's testimony to be "sufficiently tied to the facts of the case" to be admissible.  <u>Mitchell</u>, 165 F.3d at 781 (citing <u>Daubert</u>, 509 U.S. at 591).  <span style="color:red">Redacted</span>

<span style="color:red">Accordingly, the</span> Chidekel Report is unreliable and inadmissible under <u>Daubert</u> for these reasons as well.

### 3.    <span style="color:red">Redacted</span>

<span style="color:red">Redacted</span>

Redacted

     **a)**     **Dr. Chidekel's opinion that Mr. Bertschinger lacked contractual capacity during the 1999 relevant period is drawn exclusively from alleged errors on the August 11, 1999 VMC Brokerage Account application.**

For example, the sole item of evidence relied upon by Dr. Chidekel to support her opinion that Mr. Bertschinger lacked contractual capacity during the 1999 relevant period is alleged mistakes on the August 11, 1999, VMC Brokerage Account application, as compared to Mr. Bertschinger's August 4, 1999, VMC Brokerage Account application, which Dr. Chidekel admitted Mr. Bertschinger completed correctly and in full.  (See Chidekel Report, Ex. 1 at 25–28; Chidekel Dep, Ex. 5 at 160:4–164:6.)  The Chidekel Report claims that these errors are evidence that Mr. Bertschinger would have failed a

mental status examination at the time he completed the agreement.  (<u>See</u> Chidekel Report, Ex. 1 at 26.)  Redacted

Dr. Chidekel's testimony regarding the alleged errors on the August 11, 1999, application also revealed numerous faulty assumptions made by Dr. Chidekel.  For instance, the Chidekel Report assumes without evidence that several parts of the application that Mr. Bertschinger that either failed to complete or that were crossed out was evidence of his inability to follow instructions.  (<u>See</u> <u>id.</u> at 27.)  But Dr. Chidekel admitted, however, that she did not consider that the application was likely the product of a telephone conversation between Mr. Bertschinger and VMC due to the fax headers on the document indicating that it was faxed to Mr. Bertschinger by VMC and later the same day returned to VMC by Mr. Bertschinger by fax.  (<u>See</u> Chidekel Dep., Ex. 3 at 174:8–15.)

Dr. Chidekel also identified inconsistencies between Mr. Bertschinger's investment objectives and reported income on the August 4, 1999, and August 11, 1999, applications.  (<u>See</u> Chidekel Report, Ex. 1 at 26–27.)  But Dr. Chidekel admitted that she did not consider that Mr. Bertschinger may have simply changed his mind regarding his investment objectives from one week to the next.  She further admitted to incorrectly

20

relying on business tax returns and that she had no evidence as to Mr. Bertschinger's personal income.  (See Chidekel Dep., Ex. 3 at 160:19–162:15.)

The Chidekel Report further assumes that Mr. Bertschinger would never sign an agreement with an arbitration clause without first interlineating it because his practice was to interlineate "under penalty of perjury" on tax returns to safeguard what he believed to be his due process rights.  (Chidekel Report, Ex. 1 at 28.)  Yet, Dr. Chidekel admitted that (i) Mr. Bertschinger would not have been able to obtain a brokerage account in 1999 unless he agreed to an arbitration provision; (ii) that there is no evidence that Mr. Bertschinger ever discussed arbitration or contracts with arbitration provisions with anyone; and (iii) there is no evidence that VMC was ever aware of Mr. Bertschinger's views about his due process rights.  (See Chidekel Dep., Ex. 3 at 191:21–192:5; 207:7–208:21.)

The Chidekel Report also never explains why alleged errors on one account application is sufficient to draw any conclusions about Mr. Bertschinger's capacity to enter into other contracts during the three months prior and afterward.  When confronted with the numerous documents showing Mr. Bertschinger conducting his financial affairs that are set forth above, Dr. Chidekel's testimony was that she either did not consider them because they fell outside the relevant periods, the scope of her expertise, or she had missed them during her review of the records.[7]  If they were inside the relevant periods, Dr. Chidekel defaulted to unsupported opinions that he lacked capacity at the time.  (See id. at

---

[7]  See supra Section II.C.2.c.

125:8–126:1; 137:2–19; 139:2–140:20; 204:17–205:2.)  But with respect to each of Mr. Bertschinger's financial transactions during the 1999 relevant period, Dr. Chidekel further admitted that there was no evidence that any were the product of "irrational behavior" that would be required by the applicable legal standard used in the Chidekel Report.  (See id. at 137:2–141:12.)

Finally, Dr. Chidekel's conclusion that VMC "had reason to know" of Mr. Bertschinger's allegedly compromised mental state is completely unsupported.  First, as mentioned above, Dr. Chidekel admitted that nothing in Mr. Bertschinger's numerous other dealings with VGI or VMC—including his completion of the outdated August 4, 1999 VMC Brokerage Account application—gave VMC any reason to suspect Mr. Bertschinger lacked contractual capacity during the relevant periods.  (See id. at 164:3–6.)  Second, the Chidekel Report assumes that VMC would compare Mr. Bertschinger's responses on the outdated application with the responses he provided in connection with the August 11, 1999, application, but there is no basis for that assumption provided in the Chidekel Report and there is no evidence supporting that assumption in the record.[8]  And third, Dr. Chidekel admitted she failed to consider that the August 11, 1999, agreement could be the product of a telephone conversation with VMC, with Mr. Bertschinger and VMC working together to obtain the necessary information and signatures VMC needed to open Mr. Bertschinger's Brokerage Account.

---

[8]  Dr. Chidekel is also not a qualified expert to opine on how a financial institution like VMC operates.

Redacted

b) **Dr. Chidekel's opinion that Mr. Bertschinger lacked contractual capacity during the 2001 relevant period is not supported by any evidence.**

Another omission in the Chidekel Report is its failure to anchor its conclusion that Mr. Bertschinger lacked contractual capacity during the 2001 relevant period to any supporting facts. The Chidekel Report's opinion concerning Mr. Bertschinger's contractual capacity *does not even mention* the September 4, 2001, VMC Margin Account Agreement or the separate pre-dispute arbitration clause Mr. Bertschinger acknowledged he received and agreed to be bound by when he signed it. (See Chidekel Report, Ex. 1 at 25–29.) The Chidekel Report does not examine the 2001 relevant period, at all. (See id.)

Dr. Chidekel admitted that nothing in Mr. Bertschinger's Margin Account Agreement indicates that he lacked contractual capacity at the time. (See Chidekel Dep., Ex. 3 at 202:2–203:25.) Dr. Chidekel further admitted that she believed that Mr. Bertschinger intended to open a margin account with VMC on September 4, 2001. (See id.) Dr. Chidekel also admitted there was nothing about the Margin Agreement that would have caused VMC to believe Mr. Bertschinger lacked contractual capacity. (See id.)

Instead, Dr. Chidekel's opinion regarding Mr. Bertschinger's contractual capacity during the 2001 relevant period appears to be based upon her personal belief and speculation that Mr. Bertschinger should not have opened up a margin account with VMC "right before 9/11" because he was trading during "a time of unprecedented kind of tumult in the culture." (Chidekel Dep., Ex. 3 at 154:16–155:15.) This testimony exemplifies many of the flaws in the Chidekel Report. First, she is not a financial expert and was forced to admit that fact repeatedly when she tried to weave unqualified financial opinions into her Report and testimony. (See Chidekel Dep., Ex. 3 at 159:12–17; 201:17–19.)[9] Second, she allowed subsequent events to color her opinions and conclusions. The Margin Agreement was signed **one week before** the events of 9/11 and it is preposterous to suggest that Mr. Bertschinger lacked capacity because he opened a margin account at this "tumultuous time." Dr. Chidekel ignores inconvenient facts and manufactures excuses to avoid the consequences of those inconvenient facts. And third, Dr. Chidekel admitted that Mr. Bertschinger made money in his Margin Account during the first year, contradicting her opinion that this was a financially irresponsible move. (See id. at 156:6–13.)

In sum, the Chidekel Report has nothing to say about Mr. Bertschinger's mental condition—specifically with respect to the Margin Account Agreement, more generally about the 2001 relevant period, or otherwise. It cites to no evidence in connection with its opinion that Mr. Bertschinger lacked contractual capacity during that time. It

---

[9]  Dr. Chidekel had a similar problem with her comments about various handwriting on the August 11, 1999 Agreement though she is not a handwriting expert. (See Chidekel Dep., Ex. 3 at 169:2–170:11.)

follows that Dr. Chidekel's ultimate conclusion that Mr. Bertschinger lacked contractual capacity during the 2001 relevant time period caused by undiagnosed Asperger's disorder is wholly unsupported, and the Court should exclude it as a result.

## III.    CONCLUSION

The Chidekel Report is a house of cards.  It relies upon a posthumous mental health diagnosis by an expert unqualified to provide one, a <span style="color:red">Redacted</span> based on methodology that is not accepted in the relevant medical or psychological community, a logically inapplicable legal standard, flawed methodology, and factually unsupported conclusions.  Any one of these deficiencies is sufficient for the Court to exclude it in its entirety.  Accordingly, for any or all of the foregoing reasons, Defendant Vanguard Marketing Corporation respectfully requests that this Court grant its Motion *in Limine* to preclude Dr. Dana Chidekel from testifying at the trial of this matter, and to preclude Plaintiff from making any use of or reference to Dr. Chidekel's report at trial.

Respectfully submitted,

*/s/ Lewis N. Carter*
Lewis N. Carter
Lance D. Bryan
DOERNER SAUNDERS DANIEL &
ANDERSON, LLP
Two West Second Street, Suite 700
Tulsa, OK 74103-3117
Phone: (918) 591-5253
Fax: (918) 925-5253
Email:  lcarter@dsda.com
          lbryan@dsda.com

*Attorneys for Defendants,*
*The Vanguard Group, Inc. and*
*Vanguard Marketing Corporation*

*/s/  Paula D. Shaffner*
Paula D. Shaffner (admitted *pro hac vice*)
Jeffrey A. Lutsky (admitted *pro hac vice*)
Brandon M. Riley (admitted *pro hac vice*)
STRADLEY RONON STEVENS &
YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA 19103
Phone: 215.564.8000
Fax: 215.564.8120
Email: pshaffner@stradley.com
          jlutsky@stradley.com
          briley@stradley.com

## <u>CERTIFICATE OF SERVICE</u>

I, Lewis N. Carter, hereby certify that on July 1, 2021, I caused a true and

correct copy of the foregoing to be served via the Court's ECF system upon the following:

James C. Milton, Esquire
Brian J. Nowlin, Esquire
Carson K. Glass, Esquire
Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.
320 South Boston Avenue, Suite 200
Tulsa, OK 74103-3706

*Attorneys for Plaintiff,*
*Jane B. Griggs as Special Administrator/Personal Representative*
*of the Estate of Richard O. Bertschinger, Sr.*

*/s/ Lewis N. Carter*
Lewis N. Carter

Dated:  July 1, 2021

26

5063914